COMMONWEALTH *vs.* JAMES KENNEDY.

No. 96-P-777.

Essex. December 13, 1996. - May 21, 1997.

Present: IRELAND, GREENBERG, & LAURENCE, JJ.

Further appellate review granted, 425 Mass. 1107 (1997).

*Search and Seizure,* Probable cause. *Constitutional Law,* Search and seizure, Probable cause. *Probable Cause. Arrest.*

In a criminal case, certain of the judge's subsidiary findings of fact were clearly erroneous where they were not supported by evidence or reasonable inferences drawn therefrom. [671-672]

On the basis of the factual record of a hearing on the motion to suppress evidence in a criminal case, this court concluded that a District Court judge erred in concluding that a police officer had probable cause to arrest and search the defendant: where, if the defendant's motion to suppress had been allowed, as it should have been, the Commonwealth's case would have been lacking in essential proof, judgment should enter for the defendant. [672-679]

COMPLAINT received and sworn to in the Lawrence Division of the District Court Department on August 30, 1994.

A pretrial motion to suppress evidence was heard by *Ellen Flatley,* J., and the case was heard by *J. Dennis Healey,* J.

*Edward B. Gaffney* for the defendant.

*Marcia H. Slingerland,* Assistant District Attorney, for the Commonwealth.

LAURENCE, J. Convicted of cocaine possession and conspiracy to violate the controlled substances laws, James Kennedy assigns as error a District Court judge's denial of his motion to suppress the drugs seized from his person during a police search after his warrantless arrest. At the hearing on that motion, the following evidence was presented, all by the arresting Lawrence police officer. At 1 P.M. on a bright, clear day, August 29, 1994, the officer was conducting a surveillance at the intersection of Park and Hampshire Streets in the central section of the city. The officer was there that day, in uniform

and in a marked police car, in response to numerous neighbor-hood complaints about drug dealing occurring outside a li-quor store at one corner of the intersection. The officer had frequently patrolled this general locale during the past two years of his eight-year police career and knew it to be a "high crime [and] high drug area," where he had personally made scores of "street level" drug arrests. (The officer did not, however, describe any of those arrests or the modus operandi of those arrested, nor did he compare the circumstances of any of those arrests with Kennedy's.)

While parked about forty yards from the liquor store, the officer saw a car being driven, as it turned out, by Kennedy (an individual then unknown to the officer) pull up and stop at the curb in front of the store. A man standing on the sidewalk walked over to the passenger side of Kennedy's car. The officer recognized the man as Ephraim Morales, who "had been the recipient [*sic*] of many complaints in the area [a]nd . . . had been identified as a person who had been ar-rested previously for narcotic sales." Morales leaned down and into the open passenger-side window. "It appeared [to the officer that] words were exchanged" between Kennedy and Morales, although the officer could not hear any of the words. After the brief conversation, "moments later," Morales "ran away" down Park Street, leaving the area. He returned "a minute" later to the passenger side of Kennedy's vehicle. Morales then "reached in, to the operator. [The officer] could see his hand going over. It appeared something had been exchanged" when "the driver reached over" to Morales, al-though the officer did not in fact see any objects being exchanged. Morales then "walked away and [Kennedy's] mo-tor vehicle drove off."

"Based on [his] knowledge, education, training and experi-ence . . . with those types of sales", the officer concluded that he had just witnessed "activities . . . [c]onsistent with a narcotics sale," particularly because of Morales's involve-ment. Pursuing Kennedy's car, the officer pulled it over within a block, ordered Kennedy out (without asking for his license or registration), frisked him, discovered in Kennedy's pocket a glassine bag containing rocks of crack cocaine, and arrested him. The officer acknowledged that he had stopped Kennedy's car solely because he "believed that a narcotics sale had just occurred." He also stated that he had frisked Kennedy "[f]or

safety purposes" because he "was concerned with weapons
. . . a fear of all police officers, especially [because of] the
way [Kennedy] had acted, fidgety, a little apprehensive, ner-
vous with my approach."

Upon being caught with the goods, Kennedy had im-
mediately offered to identify his supplier and the drug stash.
After obtaining representation, however, he decided to attack
the warrantless search as invalid, based upon neither reason-
able suspicion nor probable cause. At the hearing on
Kennedy's motion to suppress, the prosecutor asserted that
the officer's testimony evinced an investigatory stop supported
by reasonable suspicion, under the rule of *Terry* v. *Ohio*, 392
U.S. 1 (1968), and its progeny. Without explicitly ruling on
the propriety of the stop, the motion judge rejected the
contention that the officer's questionless frisk of Kennedy was
safety-inspired. She found that it "was not a protective search
for weapons for the officer's safety" — properly discrediting
the officer's factually-devoid claim to have frisked Kennedy
because of unarticulated fear for his safety, compare *Com-
monwealth* v. *Gutierrez*, 26 Mass. App. Ct. 42, 47 (1988) —
but was rather conducted solely "for the purpose of searching
[Kennedy] for drugs."

The judge nonetheless refused to suppress the product of
the frisk, ruling that the officer had probable cause to arrest
Kennedy, which justified the discovery of the cocaine in the
course of a valid search incident to arrest. The motion judge
summarized her findings and ruling as follows:

> "The activity [testified to by the officer] fits a pattern
> where a Seller is on the street, is approached by a pro-
> spective buyer, brief conversation takes place, the Seller
> moves off quickly, presumably to a nearby 'stash' and
> comes back where a quick encounter and exchange takes
> place and the buyer takes off . . . . Based on the of-
> ficer's extensive experience in street level narcotics sales,·
> his observations of a known drug dealer approaching a
> car that pulls up, followed by a brief conversation, the
> drug dealer quickly going around the corner and quickly
> coming back and the quick exchange between dealer and
> operator and the driver immediately leaving, warranted
> the officer to conclude that he was observing a classic
> street level drug transaction. Even though the [officer]

did not see the actual drugs in the dealer's hand, or the money exchange hands, the quick, furtive gestures bespoke a drug sale. While the actions might have been susceptible of other interpretations, including innocent ones, where the person on the street was a known drug dealer in a high drug area, the conclusion drawn by the officer went well beyond a suspicion or a hunch to reach a level of probable cause that a drug sale had occurred before him giving the officer the right to stop, search and arrest the defendant without a warrant."

As intuitively persuasive as the judge's conclusions appear, we are constrained to agree with Kennedy that those conclusions transcended the evidence and that his motion to suppress should have been allowed. Probable cause to arrest Kennedy — cause resting on "facts and circumstances within the knowledge of the [arresting] police [officer sufficient] . . . to warrant a prudent person in believing that the individual arrested has committed or was committing an offense," *Commonwealth* v. *Santaliz*, 413 Mass. 238, 241 (1992) — did not exist on this record.[1]

We note initially that the record to be evaluated on appellate review must be reconstituted by extracting several of the subsidiary findings of fact which, notwithstanding the deference we accord the motion judge in such matters, are clearly erroneous because they are not supported by the officer's testimony or reasonable inferences drawn therefrom. See *Commonwealth* v. *Clermy*, 421 Mass. 325, 328 (1995). There was no testimony by the officer as to any "pattern" characterizing street level drug sales, nor any evidence adduced regarding what constituted a "classic street level drug transaction"; the judge could not take judicial notice of such matters since their existence is not indisputably true or of common knowledge within the community. See Liacos, Massachusetts Evidence § 2.6, at 39 (6th ed. 1994). The testimony did not support the finding that the officer himself had ever arrested

---

[1]The Commonwealth does not here challenge the judge's ruling that the search of Kennedy could not be legitimized as a protective frisk but rather relies entirely on the motion judge's reasoning that the search was incident to a lawful arrest. It has raised no issue regarding the propriety of the officer's investigatory stop of Kennedy under the *Terry* test of reasonable suspicion based on specific and articulable facts. Compare *Commonwealth* v. *Silva*, 366 Mass. 402, 406-408 (1974); *Commonwealth* v. *Willis*, 415 Mass. 814, 817-818 (1993).

Morales, or that Morales was a "known drug dealer," since nothing indicated that his hearsay "arrests for narcotic sales" had ever resulted in any convictions or even indictments. Nothing in the officer's testimony justified the characterization that the "reaching" activity by Morales and Kennedy was either "quick" or "furtive" —indeed, the actions of the two, in broad daylight in the middle of a clear day on a public street in the unobstructed line of vision of a nearby marked police car and a uniformed police officer, appear to have been open, unconcealed, even flagrantly exposed to view. Contrast *Commonwealth* v. *Savageau, ante* 518, 518-519 (1997) (officers viewed suspects through binoculars from unmarked police car).

Most egregiously lacking in evidentiary support, and the crux of the error in this case, is the motion judge's finding that there had been a "quick exchange between dealer and operator." On direct examination, the officer testified only that "[i]t appeared something had been exchanged" as a result of the Morales-Kennedy reachings. On cross-examination, the officer readily admitted that he did not in fact see anything being exchanged between the two and that, if anything had been exchanged, it might, for all he knew, have been a totally innocent object associated with an entirely lawful activity.

On the basis of the factual record thus purged, we review the motion judge's conclusion that the circumstances were sufficient to constitute probable cause, by independently analyzing the correctness of the judge's application of pertinent constitutional principles to that record. See *Commonwealth* v. *Alvarado*, 420 Mass. 542, 544 (1995). We conclude that the warrantless search of Kennedy was not founded on probable cause but rather on only " 'a suspicion of criminal involvement,' " *Commonwealth* v. *Santaliz*, 413 Mass. at 241, based on circumstances that neither individually nor in combination objectively justified the conclusion that, at the moment of arrest, Kennedy had engaged in illicit drug activity. See *id.* at 242.

The fact that Kennedy, previously unknown to the police, stopped in a "high crime, high drug area," which was also a frequented public way bordered by commercial establishments inviting public entry, does not in itself arouse suspicion or even justify a threshold inquiry. See *Commonwealth* v. *Cheek*, 413 Mass. 492, 496-497 (1992); *Brown* v. *Texas*, 443

U.S. 47, 52 (1979). Such an occurrence was particularly unremarkable here, since Kennedy's act of pulling over to the curb of a public street at mid-day was not itself out of the ordinary. Contrast *Commonwealth* v. *Silva*, 366 Mass. 402, 407 (1974) (car found apparently disabled late at night in isolated area); *Commonwealth* v. *Almeida*, 373 Mass. 266, 271 (1977) (suspect sitting alone in car in high crime district late at night with motor running in a private parking space); *Commonwealth* v. *Moynihan*, 376 Mass. 468, 470-471 (1978) (car parked alone in normally deserted parking lot); *Commonwealth* v. *Wren*, 391 Mass. 705, 706 (1984) (van not recognized by neighbors, parked with engine running, on dead-end street in quiet residential neighborhood); *Commonwealth* v. *Egan*, 12 Mass. App. Ct. 658, 661 (1981) (car in isolated, untraveled area late at night); *Commonwealth* v. *Montgomery*, 23 Mass. App. Ct. 909, 909-910 (1986) (car driving in shopping center at extremely slow speed in early morning hours).

Further, Kennedy himself did nothing that could be characterized as inherently suspicious or furtive. Contrast *Commonwealth* v. *Anderson*, 366 Mass. 394, 400 (1974) (suspect walked briskly away from police, looking back over his shoulder several times at officer); *Commonwealth* v. *Silva*, 366 Mass. at 407 (suspect made gesture as if to conceal something in his automobile); *Commonwealth* v. *Moses*, 408 Mass. 136, 140 (1990) (suspect avoided eye contact with police and ducked beneath dashboard); *Commonwealth* v. *Alvarado*, 420 Mass. at 549 (suspect attempted to conceal objects); *Commonwealth* v. *Modica*, 24 Mass. App. Ct. 334, 338 (1987) (suspect glanced around several times as if to see whether anyone was watching as he carried box in middle of night across unlighted, snow-covered yard); *Commonwealth* v. *Tompert*, 27 Mass. App. Ct. 804, 805 (1989) (as officer approached, interior light of car went off and occupants began moving "frantically" and continually looking back at the officer); *Commonwealth* v. *Rivera*, 33 Mass. App. Ct. 311, 315 (1992) (suspect looked around when trooper put his lights on, bending forward as if to place something on the floor). To the extent the motion judge inferred a furtive attempt to conceal a drug transaction from the fact that the officer could not see whether anything was in fact being exchanged, the inference must be rejected as unacceptably question-begging in the

absence of testimony by the officer of any apparent attempt by Kennedy or Morales to conceal anything.

Kennedy's "nervousness" when stopped was not a basis on which to establish probable cause, see *Commonwealth* v. *Gutierrez,* 26 Mass. App. Ct. at 46, particularly since it was not described as unusual or extreme, contrast *United States* v. *Espinoza-Seanez,* 862 F.2d 526, 529 (5th Cir. 1988) (defendant was "nervous and sweating profusely"), and was a not uncommon reaction of even the innocent when confronted by officers of the law. See *United States* v. *White,* 890 F.2d 1413, 1418 (8th Cir. 1989), cert. denied, 498 U.S. 825 (1990); *United States* v. *Millan-Diaz,* 975 F.2d 720, 722 (10th Cir. 1992) (it is "common knowledge that most citizens . . . when confronted by a law enforcement officer . . . are likely to exhibit some signs of nervousness"); *United States* v. *Fernandez,* 18 F.3d 874, 879 (10th Cir. 1994) ("unusual nervousness" during traffic stop of a driver previously unknown to police does not give rise to reasonable suspicion).

The fact that Kennedy appeared, briefly, to be associated with another individual, Morales, who was suspected of criminal activity, would not be ground to arrest him even if there were probable cause to believe — as there was not here — that the other individual had committed a crime. *Commonwealth* v. *Dirring,* 354 Mass. 523, 531 (1968). *Commonwealth* v. *Frazier,* 410 Mass. 235, 240 (1991). Morales's purported record of previous arrests for narcotic sales — based upon his having been "identified" by persons unknown as having been arrested by persons unknown at times unknown — is, in any event, of questionable relevance to the probable cause equation for two reasons. First, there was no indication that the arrests were recent rather than ancient. See *Commonwealth* v. *Germain,* 396 Mass. 413, 418 n.7 (1985); *Commonwealth* v. *Allen,* 406 Mass. 575, 579 (1990). More significantly, the bare fact of a prior arrest, or arrests, which did not result in convictions, or at least indictments, see *Brinegar* v. *United States,* 338 U.S. 160, 173-174 (1949), is of doubtful — if any — reliability for probable cause purposes. Cf. *Commonwealth* v. *Rojas,* 403 Mass. 483, 486 (1988); *Commonwealth* v. *Mejia,* 411 Mass. 108, 111-112 (1991); *Commonwealth* v. *Malone,* 24 Mass. App. Ct. 70, 72 (1987); *Commonwealth* v. *Motta,* 34 Mass. App. Ct. 921, 922 (1993). Such conclusory, undetailed references to previous ar-

rests amount to little more than an assertion of a person's bad reputation for criminal conduct, which is so "unilluminating . . . that it is entitled to no weight in appraising" a probable cause determination. *Spinelli* v. *United States,* 393 U.S. 410, 414 (1969). See *United States* v. *Pearce,* 356 F. Supp. 756, 758 (E.D. Pa. 1973).

In sum, none of the testified-to factors attending the officer's surveillance by itself was sufficient to establish probable cause for arrest and search. Moreover, even viewing the facts and circumstances as described by the officer in sequence and in their totality — objectively, nontechnically, and through the eyes of an experienced narcotics investigator, *Commonwealth* v. *Santaliz,* 413 Mass. at 242; *United States* v. *Davis,* 458 F.2d 819, 821-822 (D.C. Cir. 1972) — we do not perceive a situation affording probable cause to conclude that illegal drug activity had occurred.

The motion judge appears to have been decisively impressed by the officer's professed experiential ability to interpret the Kennedy-Morales reaching activity as a drugs-for-money exchange, notwithstanding the officer's conceded failure to see anything being exchanged or any actual transaction taking place. The Commonwealth has not, however, cited, and we have been unable to find, any authority that recognizes as a permissible factor in the probable cause calculus the inference by a law enforcement officer — however massive his training, expertise, and experience — that he has witnessed an illegal drug transaction despite never actually seeing any identifiable object being passed or received. Every case in the Commonwealth of which we are aware in which probable cause has been found in similar circumstances has involved police observation of some tangible object, even if not readily identifiable, actually being handed over or taken by one or both of the individuals participating in the suspect activity. See, e.g., *Commonwealth* v. *Ortiz,* 376 Mass. 349, 350, 353-354 (1978); *Commonwealth* v. *Santaliz,* 413 Mass. at 240-241; *Commonwealth* v. *Alvarado,* 420 Mass. at 551-552; *Commonwealth* v. *Rivera,* 27 Mass. App. Ct. 41, 42, 45-46 (1989); *Commonwealth* v. *Johnson,* 32 Mass. App. Ct. 355, 358 (1992); *Commonwealth* v. *Benitez,* 37 Mass. App. Ct. 722, 723-724 (1994). *Commonwealth* v. *Savageau, supra* at 519. Cf. *Commonwealth* v. *Ellis,* 12 Mass. App. Ct. 476, 477 (1981) (officer actually saw object being passed by person standing

outside defendant's automobile and defendant returning something from inside, but no probable cause to arrest for suspected drug sale in the absence of other evidence to color the transaction).

The only authorities we have uncovered dealing with police interpretation of an incident as an apparent exchange of drugs for money in a high crime area, notwithstanding police failure to see anything being exchanged, have suppressed the fruits of the subsequent search, because the arrest resulting from such an inference was unsupported by probable cause. See *United States* v. *Gonzalez,* 362 F. Supp. 415, 422 (S.D.N.Y. 1973); *People* v. *Ratcliff,* 778 P.2d 1371, 1378 (Colo. 1989); *Commonwealth* v. *Hunt,* 280 Pa. Super. 205, 210-211 (1980). Each of these cases dealt with factual scenarios similar to that here, and all held that police observations of an apparent exchange of unseen objects, even in public areas plagued by drug trafficking, between an unknown defendant and (in *Gonzalez* and *Ratcliff*) a known or reputed drug dealer, and unaccompanied by any unusual or markedly furtive actions, had little if any rational tendency to be incriminating if the officer could not actually see what, if anything, had been exchanged.

We agree with the holdings of those decisions. A cogent rationale for such outcomes can be seen in 2 LaFave, Search and Seizure § 3.2(c), at 41-42 (3d ed. 1996), explaining that the appropriate application of the factor of police training and experience requires more than a simple assertion of its existence and relevance:

> "[T]he probable cause determination must ultimately be made by a judicial officer, who is not an 'expert' in matters of law enforcement, and . . . consequently it is incumbent upon the arresting or searching officer to explain the nature of his expertise or experience and how it bears upon the facts which prompted the officer to arrest or search. For example, if an officer at a hearing on a motion to suppress were to say that he made the arrest because he saw what he as an expert recognized as a marijuana cigarette, this is not a showing of probable cause. Under the probable cause standard, it must 'be possible to explain and justify the arrest to an objective third party,' and this is not accomplished by a gen-

eral claim of expertise. On the other hand, if the officer testifies fully concerning his prior experiences with marijuana cigarettes and explains in detail just how it is possible to distinguish such a cigarette from other hand-rolled cigarettes, this testimony cannot be disregarded by the judge simply because it involves expertise not shared by the judge." (Footnotes omitted.)

These observations accord with the Supreme Judicial Court's admonition that, for probable cause purposes, the significance of facts meaningful to a trained law enforcement officer but not apparent from common knowledge and experience must be explained by disclosing both the facts and the officer's inferential process based thereon. See *Commonwealth v. Taglieri*, 378 Mass. 196, 199-201 (1979). Compare *Commonwealth v. Figueroa*, 412 Mass. 745, 751 (1992) (trooper's seizure of brown paper bag wrapped inside plastic bag found partially concealed in rear window wall panel of defendant's car supported by probable cause in part because of trooper's testimony about his previous experiences of discovery of illegal drugs in similar location); *Commonwealth v. Lofty*, 8 Mass. App. Ct. 126, 130-132 (1979) (probable cause finding firmly buttressed by inferences drawn by investigating officer that activities observed were consistent with use of defendant's premises for illegal gambling, based on his prior experiences with methods of conducting illegal gaming operations; *Taglieri* distinguished because of "sketchy [factual] information" about police experience there); *Commonwealth v. Blatz*, 9 Mass. App. Ct. 603, 604-606 (1980) (probable cause for warrantless search yielding drugs contained in a particular kind of manila envelope supported by police testimony about the manner in which drugs were traded at retail and the characteristic use of such envelopes in that trade); *Commonwealth v. Lewis*, 15 Mass. App. Ct. 617, 619-620 (1983) (reasonable suspicion to stop defendant's van containing bales of marihuana supported by inferences of experienced investigator of drug smuggling based on his previous involvement in at least four major interstate smuggling operations with similar features); *United States v. Chadwick*, 393 F. Supp. 763, 768-769 (D. Mass. 1975), aff'd, 532 F.2d 773 (1st Cir. 1976), aff'd, 433 U.S. 1 (1977) (where the prosecution claimed that the unelaborated experience of a Federal agent enabled them readily to detect that Chadwick [whose car

they searched after he had put into it a footlocker he had just taken from a man he met at the train station who the agents were sure was transporting drugs in the footlocker] was a drug courier, but the District Court rejected this as representing a subjective rather than the requisite objective standard of probable cause; because the agent's purported experience with drug couriers was supported by no explanation of what there was about Chadwick in particular that made it appear he was one, leaving it a matter of speculation whether he was a courier or simply a person who had picked up a friend at the train station).

Here, there was no description of the nature of the officer's past experience in "street level drug arrests," or any explanation of how his claimed expertise allowed him to draw the reasonable inference from what he observed that Kennedy was engaged in illegal activity. We acknowledge that the concept of probable cause is "fluid," *Illinois* v. *Gates,* 462 U.S. 213, 232 (1983), and that it must be applied in a manner which accommodates the "practical considerations of everyday life on which reasonable and prudent [persons], not legal technicians, act." *Brinegar* v. *United States,* 338 U.S. at 175. We cannot, however, agree that the unique facts and circumstances of this case, as reflected in the evidence at the suppression hearing, justified a finding of probable cause to arrest Kennedy. To rule otherwise would unduly exalt the significance of generalized police expertise. It would essentially transform the probable cause concept — which is a "compromise" standard that delicately balances "safeguard[ing] citizens from rash and unreasonable interferences with privacy," on the one hand, and "giv[ing] fair leeway for enforcing the law in the community's protection," on the other, *Brinegar* v. *United States,* 338 U.S. at 176 — from an objective test, see *Beck* v. *Ohio,* 379 U.S. 89, 96-97 (1964); *Commonwealth* v. *Hason,* 387 Mass. 169, 175 (1982), into a largely subjective one. As the Federal District Court judge in *Chadwick* opined, under such a subjective approach, probable cause is in the eyes of the purportedly experienced beholder. 393 F. Supp. at 769.

Had Kennedy's motion to suppress been allowed, the Commonwealth's case would have been lacking in essential proof.

The judgments must, accordingly, be reversed, the findings are set aside, and judgments shall enter for the defendant.

*So ordered.*